**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF WEST VIRGINIA
MARTINSBURG**

**WANDA IRENE KINS,**

      **Plaintiff,**

**v.**                                  **CIVIL ACTION NO.: 3:14-CV-86
(JUDGE GROH)**

**CAROLYN W. COLVIN,
Acting Commissioner of Social Security,**

      **Defendant.**

## REPORT AND RECOMMENDATION

## I.    INTRODUCTION

On July 30, 2014, Plaintiff Wanda Irene Kins ("Plaintiff"), by counsel Jan Dils, Esq., filed a Complaint in this Court to obtain judicial review of the final decision of Defendant Carolyn W. Colvin, Acting Commissioner of Social Security ("Commissioner" or "Defendant"), pursuant to Section 205(g) of the Social Security Act, as amended, 42 U.S.C. § 405(g). (Compl., ECF No. 1). On November 10, 2014, the Commissioner, by counsel Helen Campbell Altmeyer, Assistant United States Attorney, filed an answer and the administrative record of the proceedings. (Answer, ECF No. 10; Admin. R., ECF No. 11). On December 9, 2014, and January 8, 2015, Plaintiff and the Commissioner filed their respective Motions for Summary Judgment. (Pl.'s Mot. for Summ. J. ("Pl.'s Mot."), ECF No. 14; Def.'s Mot. for Summ. J. ("Def.'s Mot."), ECF No. 17). Following review of the motions by the parties and the administrative record, the undersigned Magistrate Judge now issues this Report and Recommendation to the District Judge.

## II.  PROCEDURAL HISTORY

On March 29, 2012, Plaintiff filed her application under Title II of the Social Security Act for a period of disability and disability insurance benefits ("DIB"), alleging disability beginning on June 22, 1996. (R. 146). At the administrative hearing, counsel amended Plaintiff's onset date to February 24, 2000. (R. 155). Plaintiff alleged disability due to lower back injury, sciatic nerve problems from injury, numbness and tingling in both legs and feet, falling easily which causes broken toes, problems in both hips, breathing problems, sleep apnea and bladder and colon pressure. (R. 58).

Pursuant to sections 216(i) and 223 of the Social Security Act, the ALJ found that Plaintiff's earning record showed she had acquired sufficient quarters of coverage to remain insured through December 21, 2001 (hereinafter, "the date of last insured"). (R. 12). Thus, the issue was whether Plaintiff established disability on or before December 21, 2001 in order to be entitled to a period of disability and DIB. (R. 12).

Plaintiff's claim was initially denied on June 5, 2012 (R. 80) and was denied again upon reconsideration on July 5, 2012 (R. 92). On July 18, 2012, Plaintiff filed a written request for a hearing (R. 99), which was held before United States Administrative Law Judge ("ALJ") Karen B. Kostol by video hearing on February 13, 2014. (R. 27-56; R. 108). Plaintiff, represented by Ambria Adkins, Esquire, appeared and testified by video from Wheeling, West Virginia. (R. 29). The ALJ presided over the hearing from Morgantown, West Virginia. (Id.). Larry Ostrowski, Ph.D., an impartial vocational expert, also testified from Morgantown. (Id.). On February 27, 2014, the ALJ issued an unfavorable decision, finding that Plaintiff was not disabled within the meaning of the Social Security Act. (R. 9-23). On May 30, 2014, the Appeals Council denied Plaintiff's request for review, making the ALJ's decision the final decision of the Commissioner. (R. 1-5).

### III. BACKGROUND

**A.     Personal History**

Plaintiff was born on August 4, 1949, and was fifty-two years old on the date last insured, December 31, 2001. (R. 146). At the time of the administrative hearing, Plaintiff was sixty-four years old. (R. 33). She is married and has adult children as well as numerous grandchildren. (R. 46). She completed high school and has prior work experience as a full-time maid from 1989 to 1996. (R. 160). Plaintiff alleged that she stopped working in 1996 due to her medical conditions. (R. 159). As of March 2012, Plaintiff was entitled to receive monthly Social Security retirement benefits of approximately $220.00. (R. 76).

**B.     Medical History**

**1.   Medical History Pre-Dating Alleged Amended Onset Date of February 24, 2000**

Plaintiff sustained a back injury at work on July 27, 1989 resulting in severe low back pain radiating into the left buttock. (R. 186; R 407). An x-ray of the lumbar spine from July 11, 1990 showed normal lumbar curve and very minimal narrowing posteriorly of the L4-L5 disc space. (R. 188). The record also includes medical notes from 1989 to 1991 regarding Plaintiff's treatment prior to her back surgery. (R. 404-10).

On January 21, 1991, Dr. Fred Payne performed lumbar surgery (i.e., decompressive laminectomies and foraminotomies) on Plaintiff at the L4-L5 level due to some spinal stenosis. (R. 403). Following surgery, Plaintiff started physical therapy and reported that some of the stiffness had been alleviated. (R. 188).

On May 14, 1991, Plaintiff was seen by Dr. J.P. Griffith, Jr., M.D. with Orthopaedic Surgery, Inc. regarding her workers' compensation claim for her back injury. (R. 186-89). Plaintiff's chief complaint was stiffness and aching in the center of her lower back and occasional

burning pain extending from the lateral aspect of the left hip down to about the knee region associated with some weakness of the left lower extremity. (R. 186). The physical examination noted Plaintiff to be in mild distress during the orthopaedic examination. (R. 188). Plaintiff did not have a limp as she walked back and forth in the examining room, her heel to toe walk was adequate, she squatted at 100 percent but needed her hand on the table to rise. (Id.). Plaintiff showed some tenderness as well as limitation in her range of motion of her back and left leg. (R. 187). Straight leg raise was 80 degrees on the left and 95 degrees on the right. (Id.). She also distinguished sharp and dull pain prick in the lower extremities, feet and toes. (Id.). X-rays of the lumbar spine showed very mild scoliosis towards the left side at about L4-L5 that compensates at L3; good disc space down to and including L4-L5 although it is slightly narrower on the right side than left. (R. 187). Dr. Griffith's opinion at this time was that:

> [t]his claimant will be temporarily totally disabled due to her compensable condition until the first of June when she finishes her physical therapy sessions. After that no additional treatment would be indicated and no additional consultations. She can return to work at that time and will have reached her maximum degree of improvement and has a percentage of whole man impairment from this injury equal to 12%. She impresses me as a rather sincere individual and is anxious to get back to work.

(R. 189).

On June 3, 1991, Plaintiff was seen by Dr. Thomas S. Ream, M.D. with Warwood Family Practice complaining of persistent lower back pain. (R. 190). In a letter to the West Virginia Workers' Compensation, Dr. Ream noted that the physical examination revealed some tenderness in the L4-5 region with decreased reflex noted of L4-5 at the left knee. (Id.).

In September 1991, Plaintiff returned to work as a maid but continued to have persistent back discomfort. (R. 378). An x-ray from June 15, 1993 noted findings of an L4-5 laminectomy but was otherwise normal. (R. 379). Plaintiff continued to work until October 1996. (Id.).

On April 20, 1995, Dr. George Bontos, M.D. ordered an x-ray of Plaintiff's right hip due to complaints of pain. (R. 394). The impression showed normal findings. (Id.).

On April 22, 1998, Dr. Srini Govindan, M.D., a neurologist, ordered an electromyography (EMG) due to Plaintiff's lower extremity symptoms and to rule out radiculopathy. (R. 203). Plaintiff's diagnoses were 1) no evidence of acute radiculopathy; 2) chronic radiculopathy, mild, left L5; and 3) sensory neuropathy of sural nerve, left. (R. 204).

On May 22, 1998, Dr. Govindan wrote a letter to the West Virginia Workers' Compensation Fund regarding her compensable injury from 1989. (R. 652-53). Plaintiff's complained of back pain, hurting and aching; bilateral hip pain and discomfort; right anterolateral thigh numbness and hurting; left lower extremity radiating pain; and jerking of the left leg during the day and night as well as turning of the left leg to the right resulting in too much weight being put on the right ankle, straining the right ankle and hurting the arch of the right foot with a tendency to fall. (R. 653). Dr. Govindan explained Plaintiff's prior injury in July 1989 and her 1991 surgery and noted that "[a]fter surgery, the patient was able to return to work, but had to periodically take time off for treatment. She then tried to switch jobs, but could not do part-time because of aggravation of the back problems. Finally, she had to resign and is not employable at this time." (Id.). The neurological examination showed "positive findings for focal myoclonus and spontaneous muscle activity in the distal left lower extremity, absent bilateral ankle jerks and sensory abnormalities in the L5-S1 distribution on the left, and right lateral femoral cutaneous nerve distribution. She has some shoulder problems, but they are not part of this compensable claim." (Id.). Her diagnoses included: 1) lumbar disc displacement with radiculopathy; 2) sensory abnormalities of two dermatomes, left lower extremity; and 3) left leg focal myoclonus/restless leg syndrome since the compensable injury and treatment. (Id.).

On July 8, 1998, Dr. Bontos ordered a CT of Plaintiff's lumbar spine due to Plaintiff's back pain. (R. 395, 437). The impression showed post-operative change at the L4 and L5 levels and noted "the overall AP diameter of the canal appears broad at all levels and no evidence of nerve root entrapment could be seen." (Id.). On September 3, 1998, Dr. Bontos ordered an x-ray of Plaintiff's right shoulder following a diagnosis of right shoulder injury and to rule out a fracture or dislocation. (R. 397). The impression was negative and showed no evidence of fracture or dislocation. (Id.).

On December 1, 1998, Plaintiff had an appointment with Dr. Edward Marks. (R. 503). Plaintiff's diagnoses included urinary frequency, microscopic hematuria, hyperlipidemia, hypothyroidism and generalized fatigue. (R. 504). Dr. Marks noted that Plaintiff was seeing Dr. Govindan as her "disability doctor" due to her back injury and that he would "undertake all her other care as her family practice physician." (R. 503). Plaintiff returned for a follow-up visit on December 14, 1998 and her physical examination was largely normal. (R. 617).

Plaintiff had appointments with her primary care physician, Dr. Edward Marks, on January 25, 1999 (R. 507), March 31, 1999 (Id.), April 13, 1999 (R. 428), June 7, 1999 (Id.), August 10, 1999 (R. 512), September 1, 1999 (Id.), September 17, 1999 (R. 511), September 28, 1999 (Id.) and November 30, 1999 (R. 510). Dr. Marks noted Plaintiff's past medical history as included hyperlipidemia, hypothyroidism, irritable bowel syndrome and chronic right lumbar radiculopathy. (R. 428, 507, 511). In January, Plaintiff's diagnoses included intercostal muscle strain, hyperlipidemia and irritable bowel syndrome (R. 507). At the March visit, Dr. Marks diagnosis added chronic right lumbar radiculopathy; her medications included Soma and Darvocet for pain as necessary with Aleve during the day. (R. 428, 507). At her June visit, Plaintiff continued to report hip and low back pain and her diagnosis also included anxiety disorder. (R. 428). At her

August visit, Plaintiff reported bilateral lower anterior rib pain. (R. 512). On September 1, 1999, Dr. Marks ordered an x-ray of Plaintiff's chest due to a severe cough lasting for thirty days, which showed no active or acute cardiopulmonary abnormality. (R. 602). In September, Plaintiff continued to report left lower rib pain, back pain and anxiety. (R. 510). Due to her left rib pain, Plaintiff was diagnosed with a left intercostal muscle strain, which Dr. Marks reported as resolved by the end of the month. (Id.).

On July 27, 1999, Plaintiff received an x-ray for her severe bilateral hip pains at the request of Dr. Govindan. (R. 393, 398). The x-ray showed mild sclerosis around each SI joint with a lower lumbar laminectomy defect. (Id.). Both hips were maintained without significant arthritic change. (Id.). The impression was "no acute change since 1995." (Id.).

On August 9, 1999, Dr. Govindan provided Dr. Marks with a letter regarding Plaintiff's referral for her compensable injury problem. (R. 613). Dr. Govindan noted that Plaintiff continued to have symptoms of back pain, bilateral lower extremity symptoms, more on the left. (Id.). Her neurological examination "indicates some tenderness at the sacroiliac joint bilaterally. Decreased left ankle jerk mild and decreased sensation of the left foot dorsal. Left plantar flexor, straight-leg raising sitting 90 degrees causing no significant problem." (Id.). Dr. Govindan further noted that Neurontin was not helping and that he prescribed Soma and an increase of Klonopin at night. (Id.).

On February 11, 2000, Plaintiff presented to an appointment with Dr. Marks reporting worsening carpal tunnel syndromes, such as dropping objects, not being able to take lids off jars, tingling in her second and third digit of the right hand at times. (R. 508). The physical examination showed degenerative changes to the base of the thumbs bilaterally and to the wrist areas. (Id.). Her diagnoses were right carpal tunnel syndrome symptoms, hypothyroidism and osteoarthritis. (Id.).

**2. Medical History Post-Dating Alleged Amended Onset Date of February 24, 2000**

On February 24, 2000, Plaintiff underwent an electromyography (EMG) by Dr. John G. Tellers, M.D., a neurologist, at the request of Dr. Marks. (R. 201). Plaintiff presented with problems in both upper extremities, worse on the right with pain in the wrists and dorsum of the hand that extends up the arm, more recently towards the shoulder. (R. 201). Plaintiff also reported intermittent numbness of the finger tips with paresthesias and weak grip. (Id.). Plaintiff reported developing pain in the left leg and foot and movement of her toes following her laminectomy. (Id.). Her medications included Lipitor (for high cholesterol), Syntroid (for hyperthyroidism) and Donnatal (for irritable bowel syndrome). (Id.). The impression of the EMG noted right and left median neuropathy at the wrist (mild carpal tunnel syndrome on the right and minimal-mild carpal tunnel of the left). (R. 202). Dr. Tellers also examined Plaintiff's left distal foot and lower extremities because of movement in the lower extremity during the examination. (Id.). Dr. Tellers noted "[t]his patient has both horizontal and vertical movements that are irregular and intermittently noted in the left foot involving the movements of the toes including horizontal and lateral movement of the left fifth toe." (Id.). He opined that "[t]his patient most likely has 'painful legs and moving toes syndrome' originally described by the English neurologist, Spillane." (Id.).

In 2000, Plaintiff presented to appointments with Dr. Marks on April 7 (R. 508), June 28 (R. 509) and September 27 (Id.). Dr. Marks noted that Plaintiff's medical history included hyperlipidemia, hypothyroidism, anxiety disorder, irritable bowel syndrome and chronic low back pain. (R. 508, 621). In April, Plaintiff reported continuing problems with carpal tunnel syndrome but denied other complaints or problems; she was given carpal tunnel splints bilaterally and anti-inflammatory medication. (R. 508). In June, Plaintiff reported feeling well overall. (R. 509). In September, she reported some fatigue. (Id.). Her diagnoses included carpel tunnel syndrome,

restless legs syndrome, hypercholestermia, hyperthyroidism and general fatigue. (Id.).

On May 23, 2000, Plaintiff presented for an appointment with Dr. Gabriela Sella. (R. 216-19, 302). Plaintiff's diagnoses included low back, left leg, right knee and bilateral hip pain. (R. 302). Her prescriptions at this time included Zanaflex, a muscle relaxer used to treat muscle spasms, which Plaintiff said was not helping. (Id.). Dr. Sella documented decreased range of motion in flexion and extension of Plaintiff's dorsolumbar spine as well as decreased range of motion of the right lateral flexion of Plaintiff's back. (R. 298). The left lateral flexion of Plaintiff's back appeared normal. (R. 298). Plaintiff also completed a health history questionnaire at this time in which she noted experiencing repeated or troublesome muscle stiffness or pain; joint stiffness, pain or swelling; and back, neck and foot stiffness and pain that interferes with normal activity for more than two or three days. (R. 218). Plaintiff also noted troublesome tingling in her hands or feet, numbness in her hands or feet and trouble with coordination, trembling or shakiness. (R. 219). Plaintiff further noted that her current state of health interferes with her normal activity. (Id.).

On June 6, 2000, Plaintiff returned for an appointment with Dr. Sella and was diagnosed with low back pain, bilateral leg pain and bilateral hip pain at a nine out of ten. (R. 303). Plaintiff had additional appointments on June 16, 2000 (R. 304) (receiving pain medication and signing an authorization for trigger point injections); July 12, 2000 (R. 305); August 25, 2000 (R. 306); September 11, 2000 (R. 307); October 11, 2000 (R. 308); November 13, 2000 (R. 309); January 12, 2001 (R. 310); January 26, 2001 (R. 311); March 9, 2001 (R. 312); March 19, 2001 (R. 313); April 9, 2001 (R. 314) (Plaintiff reported the three trigger point injections helped her to move but without injections gets weakness on the left side); May 2, 2001 (R. 315); May 7, 2001 (R. 316); June 1, 2001 (R. 317); July 6, 2001 (R. 319) (Plaintiff reported increased pain with heavier work); July 13, 2001 (R. 320) (Plaintiff reported that she does not think the medications are helping her

pain); July 30, 2001 (R. 321) (Plaintiff reported twisting her back in the house with pain); August 20, 2001 (R. 322); September 21, 2001 (R. 323) (Plaintiff complained of her left foot/toes "jerking" and Celebrex, a non-steroidal anti-inflammatory medication, was added as a prescription); October 8, 2001 (R. 324) (notes indicate Dr. Marks began Plaintiff on Trazodone, an antidepressant); October 22, 2001 (R. 325); October 26, 2001 (R. 326) (Plaintiff reported severe pain but the notes indicate the injections were successful); December 14, 2001 (R. 327); and December 19, 2001 (R. 328). Plaintiff's consistent diagnosis during these appointments was for low back pain, which Plaintiff rated as high as eight, nine or ten (R. 305, 306, 308, 309, 312, 314, 315, 316, 317, 319, 322, 325, 326, 327) at some appointments or as low as five or six out of ten (R. 307, 310, 311, 321, 323, 324, 328). Dr. Sella frequently recommended stretching exercises and swimming for Plaintiff's condition. (R. 311, 314, 317, 322, 323, 328). Plaintiff's prescription medications from May 23, 2000 to December 31, 2001 included: Flexeril and Vicodin/Norco (replaced with Motrin), which was eventually changed to Skelaxin and Ultrum. (R. 369-70).

In addition to the above physical examinations by Dr. Sella, Plaintiff received trigger point injections in her hip and back on August 25, 2000 (R. 297); October 11, 2000 (R. 296); November 13, 2000 (R. 295); December 11, 2000 (R. 294); January 18, 2001 (R. 292); January 26, 2001 (R. 291); March 9, 2001 (R. 290); March 19, 2001 (R. 289); April 9, 2001 (R. 288); May 2, 2001 (R. 287); May 7, 2001 (R. 286); June 11, 2001 (R. 285); June 30, 2001 (R. 283); July 6, 2001 (R. 282); July 13, 2001 (R. 281); July 30, 2001 (R. 280); August 22, 2001 (R. 279); September 21, 2001 (R. 278); October 8, 2001 (R. 277); October 22, 2001(R. 276); October 26, 2001 (R. 275); December 14, 2001 (R. 274); and December 19, 2001 (R. 273). During these appointments, Plaintiff typically classified her pain as low as a five and as high as a nine prior to the injections with a post-injection pain at a two or three out of ten.

An undated low back examination by Dr. Sella noted that Plaintiff stands unassisted and has an antalgic lean (asymmetry) with left weakness. (R. 301). On palpation (standing, seated or prone), Plaintiff had vertebral tenderness/restriction and coccyx tenderness and her sacral base and pelvis were level. (Id.). Plaintiff also had paraspinal muscle tenderness, paraspinal muscle spasm and sacroiliac joint tenderness on the left and right. (Id.). Plaintiff had a limp on the left side and did not use an assistive devices. (Id.). Plaintiff could not squat fully and rise without difficulty. (Id.). Plaintiff's motor strength for the left hip and knee was 4.0 out of 5.0 and right hip and knee 4.5 out of 5.0. (R. 300). Plaintiff's motor strength in her ankle, toe extension, heal toe walk and toe walk was 4.5 out of 5.0 on the left and 5.0 out of 5.0 on the right. (Id.).

On April 9, 2001, Dr. Sella completed an Occupational and Disability Evaluation of Plaintiff. (R. 376). Dr. Sella reported:

> Ms. Kins had therapeutic success with the three trigger point injections that she received on the days: 3-9-2001, 3-19-2001 and 4-9-2001. She reported that she had very limited pain for about one week after each injection (received on 3-9 & 3-19-01). Consequently, she reported that she could do many more activities of daily living after the injections, and she felt much more like herself in terms of leading a fuller life without pain.
>
> As I wrote to you previously, she may need those trigger point injections only on such days as her myofascial trigger points exceed a pain level of 7/10. The pain is relieved about 90% as her trigger points are injected with xylocaine 1% (-).
>
> I would like to ask you to approve further injections as necessary for the next 3 months. As you note, she did not abuse in any way of the injections. They enabled her to be with little if any pain, exercise and perform more normal activities of daily living.

(R. 376).

Throughout 2001, Plaintiff also maintained regular appointments with her primary care physician, Dr. Marks. On January 8, 2001, Plaintiff presented to an appointment with Dr. Marks. (R. 427). Plaintiff reported occasional pain in her low back at times, anterior shoulder and base of

the neck but denied any range of motion problems with any of the areas. (Id.). Her diagnoses were cervical pain; anterior shoulder pain (greater in the right than left); and osteoarthritis – generalized. (Id.). At this time, Dr. Marks requested an x-ray of Plaintiff's cervical spine due to right neck and shoulder pain. (R. 399). The frontal, oblique and lateral views showed mild straightening of the normal lordosis with mild lower cervical spurring; no significant disc narrowing, fracture, subluxation or foraminal encroachment. (Id.). The impression showed slight spondylosis with no other change since 1992. (Id.). An x-ray of Plaintiff's right shoulder was also taken due to pain, which showed mild AC narrowing without significant spurring and no surrounding calcification; impression was AC narrowing. (R. 399-400). On March 7, 2001, Plaintiff presented with allergy symptoms and denied any other complaints or problems. (R. 426). On June 6, 2001, Plaintiff complained of right shoulder pain and ache to the anterior shoulder. (R. 426). Dr. Marks noted Plaintiff had a history of bursitis of the joint many years ago. (Id.). Plaintiff denied any limitation of range of motion or other complaints in this regard. (Id.). The physical examination showed tenderness of the right shoulder to the anterior area and supraspinatus tendon. (Id.). There was a full range of motion and lift off and drop arm test were negative. (Id.). Plaintiff was given medication and told to follow-up in three months. (Id.). On September 12, 2001, Plaintiff reported right neck pain without injury as well as her neck and shoulder being "sore." (R. 426). Her diagnosis included right trapezius strain. (Id.). On October 3, 2001, Plaintiff reported that her right shoulder pain had improved and requested a refill of Vioxx, a nonsteroidal anti-inflammatory drug. (R. 425, 502). The physical examination notes stated that the right shoulder was unchanged and her diagnosis still included right shoulder pain at this time. (Id.). On December 4, 2001, Plaintiff reported her shoulder pain had improved with Celebrex, a pain medication for arthritis. (R. 424, 501). Plaintiff's diagnosis at this time noted that her right shoulder pain had improved. (Id.).

### 3. Medical History Post-Dating December 31, 2001, Date of Last Insured

The record includes medical records from 2002 to 2012. The record includes treatment notes with Dr. Marks from 2002 to 2012 and with Dr. Sella from 2002 through 2004. The undersigned reviewed all of these records but because they fall after the date of last insured a summary of the records will not be provided. However, any relevant records will be discussed in the context of arguments raised by the parties below.

### 4. Medical Reports/Opinion Evidence
#### a. Dr. Sella's Report to WV Bureau of Employment Programs, May 25, 2000

On May 25, 2000, Dr. Sella sent a letter to the West Virginia Bureau of Employment Programs regarding the May 23 examination. (R. 386-91). Plaintiff's clinical history and complaints included low back pain, bilateral lower limb pain and bilateral hip pain associated with her back injury in 1989. (R. 390). The physical examination "revealed mainly pathology of myofascial pain syndrome nature," which would be classified as a "sacrum disorder" diagnosis. (Id.). Dr. Sella described her findings as follows:

1) Shoulder imbalance with mild dysfunction and loss of ROM of the upper back, shoulders and neck. There is loss of strength of approx.. 20% of the right shoulder compared to the left.
2) Trigger points on the upper trapezius and supraspinatus, bilaterally, rhomboid major and levator scapulae on the right, mild sudomotor changes in the inter-scapular region.
3) Trigger points with powerful jump response on the quaratus lumborum, more on the right than on the left, on L4-L5 paraspinals bilaterally, on gluteus major bilaterally, probably on the right piriformis.
4) Tender points on the acetabular area and medial knee area bilaterally.
5) Postural imbalance with placement of 30-40% more weight on the right foot. This confirms the overall gait dysfunction which is most probably multi-muscular.
6) Moderate hypoesthesia of the left S1 area to touch and vibration.

(R. 391). Dr. Sella noted that Plaintiff "needs further muscular evaluation for her multiple dysfunctions." (Id.). She concluded that her relevant positive clinical findings were "multiple areas of myofascial pain syndrome and severe postural dysfunction." (R. 392).

13

**b.    Physical Residual Functional Capacity Assessment by Rabah Boukhemis, M.D. on June 29, 2012**

Dr. Rabah Boukhemis completed a Physical Residual Functional Capacity Assessment of Plaintiff on June 29, 2012. (R. 67-69). Plaintiff's exertional limitations included: occasionally lifting/carrying twenty (20) pounds, frequently lifting/carrying ten (10) pounds; standing/walking about six (6) hours in an eight (8) hour workday; sitting for about six (6) hours in an eight (8) hour workday; and unlimited pushing/pulling. (R. 67). Plaintiff's postural limitations included occasionally climbing ramps, stairs, ladders, ropes and scaffolds, occasionally crouching and crawling and frequently balancing, stooping and kneeling. (R. 68). Plaintiff had no manipulative, visual or communicative limitations. (Id.). Plaintiff's environmental limitations included avoiding concentrated exposure to extreme cold, wetness, humidity, vibration, fumes, odors, dust, gasses, poor ventilation and hazards with unlimited exposure to extreme heat and noise. (Id.). In explaining the assessment, Dr. Boukhemis noted Plaintiff's RFC assessment from May 29, 2012, which included: cervical spine spondylosis; right shoulder AC OA, shoulder pain improved; L5 neuropathy per EMG/NCS; later laminectomy at L5/S1 prior to date of last insured. (R. 69). Dr. Boukhemis concluded "[w]ith the evidence available the DLI RFC should be light as above." (Id.).

**C.    Testimonial Evidence**

On February 13, 2014, the ALJ hearing held an administrative hearing with Plaintiff and her counsel, Ambria Adkins, Esq., appearing by video. (R. 29). Counsel stated Plaintiff's impairments included: problems with her upper extremities, worse in the right hand and arm; intermittent numbness of fingertips, and a weak grip; problems in the left leg and foot; problems with movement of her toes; mild carpal tunnel; chronic radiculopathy and some sensory neural neuropathy in the legs and lower extremities; back surgery in 1991; scoliosis of the lumbar spine;

problems with her sciatic nerve; arthritis in her hips and throughout her body; and asthma. (R. 33).

Plaintiff testified that she is married and her husband is retired. (R. 34). Plaintiff receives approximately $200.00 per month in retirement benefits. (R. 36). Plaintiff worked as a maid at Wilson Lodge at Oglebay from 1989 to 1996. (Id.). In 1996, Plaintiff worked for a few months as a waitress but quit because the work was too hard on her back. (R. 36-37).

Plaintiff further testified regarding her impairments. Plaintiff stated that she "can't do too much standing" or her back hurts so bad she must sit down. (R. 37). Plaintiff testified that her muscles in the middle of her back and through her legs hurt so bad that at times that she is unable to stand. (Id.). Plaintiff explained that the pain started prior to her surgery and starting getting worse since 1996. (Id.). Plaintiff stated that she engaged in physical therapy after her surgery and was told she could return to "light duty" work. (R. 38). She returned to work and "hung in" for about six years after the surgery but could not continue the work due to pain. (Id.). The work required her to mop floors, pull, lift, scrub, go up and down stairs and to carry items. (R. 38-39). She described the pain as in her back, down the legs and in her hands. (R. 38). She stated her left foot "jerks all the time," which has resulted in falling, hurting her ankles and breaking toes. (R. 38, 40). She described her leg pain as being on the left side of her leg from her knee and stated that half of her leg stays numb from the knee up. (R. 29). She stated she often stands up to relieve the pain but it never goes away. (Id.). She also sits down and takes carisoprodol, or Soma, which helps to ease the pain so she can "get moving." (R. 40). Plaintiff explained that she tries to only take Soma at night but if the pain is bad she will take more medication during the day. (Id.).

Plaintiff testified that standing causes her hips and lower back to tighten up and hurt, which requires her to lean against something flat or sit down. (R. 41). She explained that on some days she could stand for about fifteen minutes, doing dishes for example, before the pain starts and she

needs to bend over because it hurts her back to be straight. (R. 41-42). She stated that when it is cold she has more difficulty walking but when it is not cold, she is able to walk about two blocks to the post office and home. (R. 41). When asked to focus her attention to her medical condition to the time frame before December 31, 2001, the date of last insured, Plaintiff testified that the limitations on standing have gotten worse since that time. (R. 42). Plaintiff explained that she always had pain after the surgery but that it has gotten worse and nothing seems to help. (Id.). She stated that she had to force herself to stand for about an hour or an hour and a half but if she was bending over and moving while standing then it would be for less time because her back muscle would start tightening. (R. 43). Plaintiff said that she had problems with her hands at the time she was working. (Id). She stated that her hands would go numb while doing repetitive tasks such as tightening sheets and she would often drop things. (Id.).

As for other conditions Plaintiff struggled with from 2000-2001, Plaintiff testified that she had colon trouble, including vomiting, which she had since the 1970s. (R. 43). Plaintiff said the condition would impact her work if the pain was bad. (R. 44). When the condition was "acting up," she would either be unable to go or would frequently need to go to the bathroom. (Id.). Plaintiff was prescribed medication to help ease the pain and settle her stomach. (Id.). Plaintiff underwent colonoscopies every five years for her irritable bowel syndrome. (R. 45, 55).

Plaintiff also testified regarding her daily activities. Plaintiff drives but tries to avoid driving at night. (R. 34). She testified that she used to do plastic canvas sewing but stopped about four years prior because her hands go numb and she cannot hold the needle. (R. 45). She stated that her grandchildren and dogs keep her busy. (R. 46). Her son and grandchildren live on the same street and her son "comes and helps…a lot." (Id.). Plaintiff testified that the grandchildren would come to her house and she could take care of them but she would not able to pick them up. (R. 46-

16

47). As for chores she could perform before December 31, 2001, Plaintiff stated she could do the dishes but if the pain was bad she would need to sit down and take a break before continuing. (R. 47). She could pick up stuff around the house. (Id.). She stopped doing laundry about seven or eight years ago because the washer is in the basement and she fell on the stairs. (Id.).

**D.     Vocational Evidence**

Also testifying at the hearing was Larry Ostrowski Ph.D. a vocational expert. (R. 47). The ALJ stated that there is no past relevant work in the case. (R. 50).

With regards to Plaintiff's ability to perform other work, Mr. Ostrowski gave the following responses to the ALJ's hypothetical:

Q:     [A]ssume an individual with the same age, education, and past work experience as the claimant with the following abilities: That individual is capable of light exertional level work, can occasionally climb ladders, ropes, or scaffolds, ramps or stairs, can also occasionally crouch or crawl. Said individual can frequently balance, stoop, and kneel. Said individual must avoid concentrated exposure to extreme cold, wetness, or humidity, excessive vibration, irritants such as fumes, odors, dusts, and gases and heights. Can an individual with these limitations perform work?

A:     Yes, your honor. There would be the work of an office helper. This is a light and unskilled job with an SVP of 2…[There] would be the work of a marker. This is light and unskilled job with an SVP of 3…There would be the work of a mail clerk. This would be an individual working in a mail room of a business as opposed to working for the postal service. It is a light and unskilled job with an SVP of 2.

Q:     And if you assume the same individual and limitations as described in the first hypothetical with the additional limitation or limitations: That said individual must be afford the opportunity to brief one to two minute changes in position. That individual is not to exceed 30 minutes without being off-task. Would those job remain available?

A:     The jobs of mail clerk and office helper would, your honor, but not the work of a marker.

Q:     Would there be other jobs that this individual could perform?

A:     Yes, your honor. There would be the work of a storage facility rental clerk. This is

a light and unskilled job with an SVP of 2…

Q:     Could this individual perform that job if they were capable of frequent handling bilaterally?

A:     Yes, your honor.

Q:     …If the individual…had an additional limitation of occasional reaching overhead with the right upper-extremity, would they still be capable of performing those jobs?

A:     Well, we're referring to the jobs requiring a sit stand option – storage facility rental clerk, office helper and mail clerk, your honor. Is that correct?

Q:     Yes.

A:     This individual would still be able to do those three jobs.

(R. 50-52). Incorporating the above hypothetical, the ALJ then questioned Mr. Ostrowski regarding Plaintiff's ability to perform other unskilled work at a sedentary exertional level:

Q:     At the sedentary exertional level, what jobs would be available with all of the limitations previously given?

A:     Well, your honor. There would be the work of a surveillance system monitor…document preparer…an ampule sealer.

Q:     And if the individual were limited to simple, routine, and repetitive tasks, would those sedentary jobs remain available?

A:     Yes, your honor.

Q:     Would the jobs that you listed at the light exertional level remain available?

A:     Yes, your honor.

Q:     And if the individual were off-task – or to miss work 20 percent of the work week or greater, what jobs would be available?

A:     There would be no jobs, your honor.

Q:     How much time off-task do most employers tolerate?

A:     There are studies that show that an individual can be off-task up to 10 percent of a

18

work period and still be able to maintain levels of productivity required by employers.

(R. 53-54). Plaintiff's attorney then questioned Mr. Ostrowski:

Q:    [G]oing back to the light jobs you listed, if a hypothetical person were limited to occasional use of their hands for fingering, feeling, and gripping, and handling, would they be able to perform those jobs?

A:    No.

Q:    And the sedentary jobs with the same limitation, would they be able to perform those?

A:    The individual would be able to do the work as a surveillance system monitor, but not the work of a document preparer or an ampule sealer.

(R. 54-55).

## E.    Lifestyle Evidence

On June 18, 2012, Plaintiff reported her conditions affect her ability to care for her personal needs as it takes her longer to complete personal tasks, she is unable to stand or walk for a period of time, cannot bend over or lift anything and must take frequent breaks. (R. 174). On June 18, 2012, Plaintiff reported similar impacts on her activities as well as needing assistance completing household chores. (R. 179).

## IV.    THE FIVE-STEP EVALUATION PROCESS

To be disabled under the Social Security Act, a claimant must meet the following criteria:

An individual shall be determined to be under a disability only if his physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy, regardless of whether such work exists in the immediate area in which he lives, or whether a specific job vacancy exists for him, or whether he would be hired if he applied for work…'[W]ork which exists in the national economy' means work which exists in significant numbers either in the region where such individual lives or in several regions of the country.

42 U.S.C. § 423(d)(2)(A) (2006). The Social Security Administration uses the following five-step sequential evaluation process to determine if a claimant is disabled:

> (i) At the first step, we consider your work activity, if any. If you are doing substantial gainful activity, we will find that you are not disabled.

> (ii) At the second step, we consider the medical severity of your impairment(s). If you do not have a severe medically determinable physical or mental impairment that meets the duration requirement . . . or a combination of impairments that is severe and meets the duration requirement, we will find that you are not disabled.

> (iii) At the third step, we also consider the medical severity of your impairments(s). If you have an impairment(s) that meets or equals one of our listings . . . and meets the duration requirement, we will find that you are disabled.

> [Before the fourth step, the residual functioning capacity of the claimant is evaluated based "on all the relevant medical and other evidence in your case record . . ." 20 C.F.R. §§ 404.1520; 416.920 (2011).]

> (iv) At the fourth step, we consider our assessment of your residual functional capacity and your past relevant work. If you can still do your past relevant work, we will find that you are not disabled.

> (v) At the fifth and last step, we consider our assessment of your residual functional capacity and your age, education, and work experience to see if you can make an adjustment to other work. If you can make an adjustment to other work, we will find that you are not disabled. If you cannot make an adjustment to other work, we will find that you are disabled.

20 C.F.R. §§ 404.1520; 416.920 (2011). If the claimant is determined to be disabled or not disabled at one of the five steps, the process does not proceed to the next step. Id.

## V.    ADMINISTRATIVE LAW JUDGE'S DECISION

Utilizing the five-step sequential evaluation process described above, the ALJ made the following findings:

**1.    The claimant last met the insured status requirements of the Social Security Act on December 31, 2001.**

**2.    The claimant did not engage in substantial gainful activity during the period from her alleged onset date of June 22, 1996 through her date**

last insured of December 31, 2001 (20 CFR 404.1571 *et seq*.).[1]

3.      Through the date last insured, the claimant had the following severe impairments: degenerative disc disease of the lumbar spine, status post laminectomy at L5-S1; mild degenerative disc disease of the cervical spine; irritable bowel syndrome; obesity; and mild bilateral carpal tunnel syndrome (20 CFR 404.1520(c)).

4.      Through the date last insured, the claimant did not have an impairment or combination of impairments that met or medically equaled the severity of one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 404.1520(d), 404.1525, 404.1526).

5.      The undersigned finds that, through the date last insured, the claimant had the residual functional capacity to perform light work as defined in 20 CFR 404.1567(b) except: can only occasionally climb ladders, ropes or scaffolds, ramps or stairs, crouch and crawl; can only frequently balance, stoop and kneel; must avoid concentrated exposure to extreme cold, wetness or humidity, excessive vibration and irritants such as flumes, odors, dust and gases, and hazards such as dangerous moving machinery and unprotected heights; must be afforded the opportunity for brief 1-2 minute changes of position at intervals not to exceed 30 minutes w/out being off task; and capable of only frequent handing bilaterally.

6.      The claimant has no past relevant work (20 CFR 404.1565).

7.      The claimant was born on August 4, 1949 and was 52 years old, which is defined as an individual closely approaching advanced age, on the date last insured (20 CFR 404.1563).

8.      The claimant has at least a high school education and is able to communicate in English (20 CFR 404.1564).

9.      Transferability of job skills is not an issue because the claimant does not have past relevant work (20 CFR 404.1568).

10.      Through the date last insured, considering the claimant's age, education, work experience, and residual functional capacity, there were jobs that existed in significant numbers in the national economy that the claimant could have performed (20 CFR 404.1569 and 404.1569(a)).

---

[1] While neither party addressed the issue in their briefs, the undersigned notes that the ALJ utilizes Plaintiff's initial on-set date of June 22, 1996 even though Plaintiff amended her on-set date to February 24, 2000. (R. 155).

**11.**     **The claimant was not under a disability, as defined in the Social Security Act, at any time from June 22, 1996, the alleged onset date, through the date of this decision (20 CFR 404.1520(g)).**

(R. 21-28).

## VI.   DISCUSSION

### A.    Standard of Review

In reviewing an administrative finding of no disability the scope of review is limited to determining whether "the findings of the Secretary are supported by substantial evidence and whether the correct law was applied." Hays v. Sullivan, 907 F.2d 1453, 1456 (4th Cir. 1990). Substantial evidence is "such relevant evidence as a reasonable mind might accept to support a conclusion." Richardson v. Perales, 402 U.S. 389, 401 (1971) (quoting Consolidated Edison Co. v. NLRB, 305 U.S. 197, 229 (1938)). Elaborating on this definition, the Fourth Circuit has stated that substantial evidence "consists of more than a mere scintilla of evidence but may be somewhat less than a preponderance. If there is evidence to justify a refusal to direct a jury verdict were the case before a jury, then there is 'substantial evidence.'" Shively v. Heckler, 739 F.2d 987, 989 (4th Cir. 1984) (quoting Laws v. Celebrezze, 368 F.2d 640, 642 (4th Cir. 1968)). However, "it is not within the province of a reviewing court to determine the weight of the evidence, nor is it the court's function to substitute its judgment…if the decision is supported by substantial evidence." Hays, 907 F.2d at 1456 (citing Laws, 368 F.2d at 642; Snyder v. Ribicoff, 307 F.2d 518, 529 (4th Cir. 1962)). In reviewing the Commissioner's decision, the reviewing court must also consider whether the ALJ applied the proper standards of law: "[a] factual finding by the ALJ is not binding if it was reached by means of an improper standard or misapplication of the law." Coffman v. Bowen, 829 F.2d 514, 517 (4th Cir. 1987).

**B.  Contention of the Parties**

Plaintiff, in her motion for summary judgment, asserts that the Commissioner's decision "is based upon an error of law and is not supported by substantial evidence."  (Pl.'s Mot. at 1.) Specifically, Plaintiff alleges that:

- the ALJ erred in failing to consider the findings of an examining source, which resulted in an unsupported step two finding that Kins' shoulder and leg impairments were not severe.
- the ALJ's residual functional capacity ("RFC") finding erroneously did not take into account all of Kins' medically determinable impairments and other evidence.
- the ALJ did not properly evaluate Kins' credibility.

(Pl.'s Br. in Supp. of Mot. for Summ. J. ("Pl.'s Br.") at 7-12, ECF No. 16).  Plaintiff contends that the "ALJ made significant reversible errors in this case" and asks the Court to "enter an order reversing or remanding the Commissioner's decision for an award of benefits" or "for remand in order that the Commissioner may correct the errors made below. (Id.).

Defendant, in his motion for summary judgment, asserts that the decision is "supported by substantial evidence and should be affirmed as a matter of law." (Def.'s Mot. at 1).  Specifically, Defendant alleges that:

- the ALJ properly considered the findings Dr. Sella, and concluded that Plaintiff's shoulder and left foot did not preclude her from performing light work with additional restrictions.
- the ALJ accounted for all functional limitations supported by the record.
- the ALJ properly evaluated the credibility of Plaintiff's complaints.

(Def.'s Mem. in Supp. Of Def.'s Mot. for Summ. J. ("Def.'s Br.") at 5-13, ECF No. 18).

**C.  Discussion of the Administrative Law Judge's Decision**

**1.  Whether the ALJ Failed In Finding Plaintiff's Shoulder and Leg Impairments Were Not Severe Impairments.**

At step two of the sequential evaluation, the claimant bears the burden of production and proof that he had a severe impairment. Grant v. Schweiker, 699 F.2d 189, 191 (4th Cir. 1983). To be "severe," an impairment or combination of impairments must significantly limit the claimant's

physical or mental abilities to perform basic work activities. 20 C.F.R. § 404.1520(c). Any impairment must result from abnormalities which can be shown by medically acceptable clinical and laboratory diagnostic techniques. 20 C.F.R. § 404.1508. Unless the impairment will result in death, it must have lasted or be expected to last for a continuous period of at least twelve months. 20 C.F.R. § 404.1509. Moreover, a mere diagnosis of a condition is insufficient to prove disability; instead, there must be a showing of related functional loss. See Gross v. Heckler, 785 F.2d 1163, 1165 (4th Cir. 1986). Furthermore, "[t]he severity standard is a slight one in this Circuit." Stemple v. Astrue, 475 F. Supp. 2d 527, 536 (D. Md. 2007). "[A]n impairment can be considered as 'not severe' only if it is a slight abnormality which has such a minimal effect on the individual that it would not be expected to interfere with the individual's ability to work, irrespective of age, education, or work experience." Evans v. Heckler, 734 F.2d 1012, 1014 (4th Cir. 1984).

Here, the ALJ found that Plaintiff's severe impairments were degenerative disc disease of the lumbar spine, status post laminectomy at L5-S1; mild degenerative disc disease of the cervical spine; irritable bowel syndrome;[2] obesity; and mild bilateral carpal tunnel syndrome. (R. 14). Plaintiff's non-severe impairments included shoulder pain, irritable bowel syndrome, anxiety disorder, sciatic nerve problems, numbness and tingling in her legs and feet, broken toes, bilateral hip problems, breathing problems, sleep apnea and bladder problems. (R. 15).

Plaintiff argues that the ALJ erred by failing to consider the findings of Dr. Sella, an examining source physician, which resulted in an unsupported step two finding that Plaintiff's shoulder and leg impairments were non-severe impairments. (Pl.'s Br. at 7). Plaintiff asserts that Dr. Sella's report demonstrates that Plaintiff's shoulder and leg impairments impact her ability to

---

[2] While the ALJ lists irritable bowel syndrome as a severe impairment, the ALJ's further analysis demonstrates that the ALJ considered Plaintiff's irritable bowel syndrome to be a non-severe impairment.

perform basic work activities. (Id.). Plaintiff argues that the ALJ failed to incorporate these impairments into her step two analysis and gave no explanation of whether or how she considered Dr. Sella's observations and findings. (Id. at 8). Even though the ALJ proceeded on to the subsequent sequential evaluation steps, Plaintiff argues that the ALJ's error at step two is not harmless because the ALJ failed to consider Plaintiff's shoulder and leg impairments in the subsequent steps of her evaluation and incorporate those non-severe but medically determinable impairments into account when formulating the RFC. (Id. at 9; Pl.'s Reply at 2).

Defendant argues that the ALJ explicitly considered Dr. Sella's findings and reasonably concluded that Plaintiff's shoulder and left foot impairments did not preclude her from performing light work with additional restrictions. (Def.'s Br. at 6). Defendant asserts that the evidence does not establish permanent work-preclusive functional limitations in using her legs or shoulders. (Id. at 7-8). Defendant further argues that a non-severe finding at step two does not warrant remand because it is merely a threshold analysis and the ALJ proceeded to the remaining steps as such any error is merely harmless. (Id. at 9-10). Defendant asserts that the ALJ accounted for any limitations resulting from Plaintiff's severe and non-severe impairments in assessing Plaintiff's RFC. (Id.).

a.    **Shoulder Impairment**

The ALJ found Plaintiff's alleged shoulder pain to be a non-severe impairment. The medical evidence includes the following treatment notes regarding Plaintiff's shoulder:

Prior to her on-set date, on May 22, 1998, Dr. Govindan noted that Plaintiff "has some shoulder problems, but they are not part of this compensable claim." (R. 653). On September 3, 1998, Dr. Bontos ordered an x-ray of Plaintiff's right shoulder, which showed no evidence of fracture or dislocation; the diagnosis was right shoulder injury. (Id.). (R. 397).

Throughout 1999, Plaintiff received treatment by Dr. Marks and Dr. Govindan. These

appointments noted right lumbar radiculopathy, low back pain, hip pain and left lower rib pain but there were no reports of shoulder pain or injury. (R. 393, 398, 428, 507, 510-12, 602).

After Plaintiff's on-set date of February 24, 2000, Plaintiff did not initially report shoulder problems to Dr. Marks. (R. 508-09, 621). On May 23, 2000, Plaintiff presented to an appointment with Dr. Sella (R. 216-19, 302), who then drafted a report to the West Virginia Bureau of Employment Programs regarding the examination. (R. 386-91). Dr. Sella made specific findings regarding Plaintiff's shoulder, which included:

1) Shoulder imbalance with mild dysfunction and loss of ROM of the upper back, shoulders and neck. There is loss of strength of approx. 20% of the right shoulder compared to the left.
2) Trigger points on the upper trapezius and supraspinatus, bilaterally, rhomboid major and levator scapulae on the right, mild sudomotor changes in the inter-scapular region.

(R. 391). Overall, Dr. Sella noted "multiple dysfunctions" with a main pathology of myofascial pain syndrome, or a sacrum disorder. (R. 390). Plaintiff continued to see Dr. Sella from 2000 to 2004 for trigger point injections in her back and hip.

On January 8, 2001, Plaintiff presented to an appointment with Dr. Marks and reported occasional pain in her shoulder and base of the neck but denied any range of motion problems with any of the areas. (R. 427). Her diagnosis included anterior shoulder pain (greater in the right than left) and osteoarthritis – generalized. (Id.). An x-ray of Plaintiff's right shoulder was also taken due to pain, which showed mild AC narrowing without significant spurring and no surrounding calcification; impression was AC narrowing. (R. 399-400).

On March 7, 2001, Plaintiff presented with allergy symptoms and denied any other complaints or problems. (R. 426).

On June 6, 2001, Plaintiff complained of right shoulder pain and ache to the anterior

26

shoulder. (R. 426). Dr. Marks noted Plaintiff had a history of bursitis of the joint many years ago. (Id.). Plaintiff denied any limitation of range of motion or other complaints in this regard. (Id.). The physical examination showed tenderness of the right shoulder to the anterior area and supraspinatus tendon. (Id.). There was a full range of motion and lift off and drop arm test were negative. (Id.). Plaintiff was given medication and told to follow-up in three months. (Id.).

On September 12, 2001, Plaintiff reported right neck pain without injury as well as her neck and shoulder being "sore." (R. 426). Her diagnosis included right trapezius strain. (Id.).

On October 3, 2001, Plaintiff reported that her right shoulder pain had improved and requested a refill of Vioxx, a nonsteroidal anti-inflammatory drug. (R. 425, 502). The physical examination notes stated that the right shoulder was unchanged and her diagnosis still included right shoulder pain at this time. (Id.).

On December 4, 2001, Plaintiff reported her shoulder pain had improved with Celebrex, a pain medication for arthritis. (R. 424, 501). Plaintiff's diagnosis at this time noted that her right shoulder pain had improved. (Id.).

While Plaintiff's date of late insured is December 31, 2001, the evidence of record included medical records through 2012. The Court notes that these records contain additional references to Plaintiff's shoulder condition, which indicate Plaintiff's shoulder pain did not dissipate completely prior to her date of last insured, but rather remained an ongoing condition for Plaintiff. See Bird v. Comm'r of Soc. Sec. Admin., 699 F.3d 337, 340 (4th Cir. 2012) (citing Wooldridge v. Bowen, 816 F.2d 157, 160 (4th Cir. 1987) (explaining that "[m]edical evaluations made after a claimant's insured status has expired are not automatically barred from consideration and may be relevant to prove a disability arising before the claimant's DLI."). For example on March 4, 2002, Dr. Marks noted that Plaintiff's shoulder pain was still improving. (R. 500). Dr. Marks treatment notes also

include reports of shoulder pain on August 17, 2004 (R. 493), May 10, 2005 (R. 431-32), May 6, 2005 (R. 490), November 28, 2006 (R. 421; R. 481) and July 24, 2007 (R. 419; R. 477). On November 30, 2006, Plaintiff received an x-ray of her right shoulder due to reports of pain, which again showed joint narrowing. (R. 591).

In addition to this medical evidence, Plaintiff testified at the administrative hearing regarding limitations due to her back pain. The undersigned notes that Plaintiff does not specifically attribute pain to her shoulders but rather describes her symptoms generally as back pain. For example, Plaintiff testified that her muscles in the middle of her back hurt so bad that at times that she is unable to stand. (R. 37). Plaintiff explained that the pain started prior to her surgery but starting getting worse in 1996. (Id.). Plaintiff stated that she returned to work and "hung in" for about six years after the surgery but could not continue the work due to pain. (R. 38). The work required her to mop floors, pull, lift, scrub, go up and down stairs and to carry items. (R. 38-39). Plaintiff testified that the grandchildren would come to her house and she could take care of them but she would not able to pick them up. (R. 46-47). As for chores she could perform before December 31, 2001, Plaintiff testified that she could do the dishes but if the pain was bad she would need to sit down and take a break before continuing. (R. 47). She said that she would be able to pick stuff up around the house. (Id.).

In finding Plaintiff's shoulder pain to be non-severe, the ALJ noted Plaintiff's January 8, 2001 x-ray, which revealed slight spondylosis and mild AC narrowing without significant spurring but also noted that by December 2001, Plaintiff reported her shoulder pain was improved with medication. (R. 15). Accordingly, the ALJ found "that this is a nonsevere impairment causing no more than minimal function limitations." (Id.).

The undersigned finds that substantial evidence supports the ALJ's conclusion that

Plaintiff's shoulder impairment was non-severe. The medical evidence of record as outlined above indicates that Plaintiff's shoulder impairment did not cause more than a "slight abnormality" with more than a "minimal effect" as to interfere with Plaintiff's ability to work. While Dr. Sella's report notes loss of a range of motion and loss of strength in Plaintiff's right shoulder in May 2000 (R. 391), there were no other reports or treatment by Plaintiff's treating physicians regarding shoulder pain during this time. By January 8, 2001, however, Plaintiff did report shoulder pain to Dr. Marks (R. 427) and her x-ray at this time showed mild AC narrowing in her right shoulder. (R. 399-400). While Plaintiff continued to report shoulder pain on June 6, 2001 (R. 426) and September 12, 2001 (R. 427), she denied any limitation of range of motion. By October 3, 2001 (R. 426) and December 4, 2001 (R. 424), Plaintiff reported an improvement of shoulder pain with medication. While medical records following Plaintiff's date of last insured indicate Plaintiff continued to report shoulder pain, these records also indicate that Plaintiff denied any loss of range of motion or any further limitations associated with her shoulder. (R. 431-32; R. 481; R. 490; R. 591). Moreover, Plaintiff failed to allege specific limitations with regard to her shoulder in her testimony or disability reports. While Plaintiff may have experienced some shoulder pain prior to her date of last insured, the longitudinal record does not demonstrate an impairment that significantly limits Plaintiff's physical ability to perform basic work activities. Accordingly, the undersigned finds that substantial evidence supports the ALJ's finding that Plaintiff's shoulder impairment was non-severe at step two of the sequential evaluation process.

     **b.**    **Sciatic Nerve Problems and Numbness and Tingling in Legs and Feet ("Leg Impairments")[3]**

---

[3] The undersigned notes that throughout the record Plaintiff's problems with pain, numbness and tingling in her legs and feet implicate various diagnoses. For example, radiculopathies are defined as "characteristic radicular syndromes of pain and segmental neurologic deficits based on the cord level of the affected root." Michael Rubin, MDCM, *Nerve Root Disorders (Radiculopathies)*, THE MERCK MANUAL (March 2014), http://www.merckmanuals.com. "Segmental radicular deficits" means "pain or paresthesias in a dermatomal distribution, weakness of muscles innervated by the

The ALJ also found Plaintiff's sciatic nerve problems and numbness and tingling in her legs and feet ("leg impairments") to be non-severe impairments. The medical evidence of record includes the following treatment notes regarding Plaintiff's sciatic nerve problems, radiculopathy, restless leg syndrome and lower extremity symptoms:

Prior to her on-set date, on April 22, 1998, Dr. Govindan, conducted an EMG due to Plaintiff's lower extremity symptoms. (R. 203). The diagnoses included chronic radiculopathy, mild, left L5 and sensory neuropathy of sural nerve, left. (R. 204). On May 22, 1998, Dr. Govindan noted that Plaintiff complained of left lower extremity radiating pain and jerking of the left leg during the day and night as well as turning of the left leg to the right resulting in too much weight being put on the right ankle, straining the right ankle and hurting the arch of the right foot with a tendency to fall. (R. 653). Her diagnoses included: 1) lumbar disc displacement with radiculopathy; 2) sensory abnormalities of two dermatomes, left lower extremity; and 3) left leg focal myoclonus/restless leg syndrome since the compensable injury and treatment. (Id.).

Throughout 1999, Plaintiff received treatment by Dr. Marks and Dr. Govindan. These appointments noted chronic right lumbar radiculopathy along with back pain for which Plaintiff received prescription medication. (R. 428, 507, 511). On August 9, 1999, Dr. Govindan noted that Plaintiff continued to have symptoms of back pain and bilateral lower extremity symptoms, more on the left. (R. 613). Her neurological examination "indicates some tenderness at the sacroiliac

---

root." Id. Specifically, L5 radiculopathy (first diagnosed by Dr. Govindan) involves "[p]ain in the buttock, posterior lateral thigh, calf, and foot. Footdrop with weakness of the anterior tibial, posterior tibial, and peroneal muscles. Sensory loss over the shin and dorsal foot." Id. In addition to her lumbar radiculopathy diagnosis, Plaintiff was diagnosed with focal myoclonus/restless leg syndrome, which is defined as "a brief, shocklike contraction of a muscle or group of muscles." Hector A. Gonzalez-Usigli, MD and Alberto Espay, MD, *Myoclonus,* THE MERCK MANUAL (January 2013). Also, sciatica occurs when "[p]ain radiates along the course of the sciatic nerve, most often down the buttocks and posterior aspect of the leg to below the knee. The pain is typically burning, lancinating, or stabbing. It may occur with or without low back pain." Sally Pullman-Mooar, MD, *Sciatica*, THE MERCK MANUAL (March 2013).

joint bilaterally. Decreased left ankle jerk mild and decreased sensation of the left foot dorsal. Left plantar flexor, straight-leg raising sitting 90 degrees causing no significant problem." (Id.).

On February 24, 2000, Plaintiff's amended on-set date, Plaintiff underwent an EMG by Dr. Tellers. (R. 201). While Plaintiff presented for an assessment of her carpel tunnel syndrome, she also reported pain in the left leg and foot and movement of her toes following her back surgery. (Id.). Dr. Tellers then examined Plaintiff's left distal foot and lower extremities because of movement in the lower extremity during the examination. (Id.). Dr. Tellers noted "[t]his patient has both horizontal and vertical movements that are irregular and intermittently noted in the left foot involving the movements of the toes including horizontal and lateral movement of the left fifth toe." (Id.). He opined that "[t]his patient most likely has 'painful legs and moving toes syndrome' originally described by the English neurologist, Spillane." (Id.). On April 7, 2000, Dr. Mark's treatment notes include restless leg syndrome as a diagnosis. (R. 508).

In Dr. Sella's May 25, 2000 report, Dr. Sella's physical examination revealed normal deep tendon reflexes, Romberg and Tandem walk were equivocal, no use of ambulatory aids but that Plaintiff's toe walking, heel walking, everted and inverted foot walking, squatting and standing from squatting were done poorly. (R. 388). Dr. Sella also noted that sensation to touch, pin prick and cold was normal with the exception to the lateral left foot with five out of ten hyposthesia. (Id.). Dr. Sella's findings as to Plaintiff's legs/feet included:

3) Trigger points with powerful jump response on the quaratus lumborum, more on the right than on the left, on L4-L5 paraspinals bilaterally, on gluteus major bilaterally, probably on the right piriformis.
4) Tender points on the acetabular area and medial knee area bilaterally.
5) Postural imbalance with placement of 30-40% more weight on the right foot. This confirms the overall gait dysfunction which is most probably multi-muscular.

(Id.). Dr. Sella noted that Plaintiff "needs further muscular evaluation for her multiple

dysfunctions." (Id.). She concluded that her relevant positive clinical findings were "multiple areas of myofascial pain syndrome and severe postural dysfunction." (R. 392). Plaintiff continued to receive treatment by Dr. Sella throughout 2000 and 2001. In an undated lower back examination during this time period, Dr. Sella noted Plaintiff had an antalgic lean (asymmetry) with left weakness and a limp on the left. (R. 301). On September 21, 2001, Plaintiff reported to Dr. Sella that her left foot/toes were "jerking." (R. 323).

The medical records post-dating Plaintiff's date of last insured similarly show that her leg impairments remained an ongoing condition. Plaintiff reported falling to Dr. Marks on March 4, 2002 (R. 500) and May 31, 2002 (R. 334) at which time she also noted that her foot "jerks" to the right. On September 26 2003, Dr. Marks ordered an x-ray of Plaintiff's left ankle due to reported trauma. (R. 598). While not probative of disability during the relevant time frame, these records demonstrate an on-going impairment regarding Plaintiff's lower extremities resulting in falling. See Bird, 699 F.3d at 340.

In addition to the objective medical evidence, Plaintiff also testified at the administrative hearing as to her leg impairments. Plaintiff testified that her muscles in the middle of her back and through her legs hurt so bad that at times that she is unable to stand. (R. 37). She stated her left foot "jerks all the time," which has resulted in falling, hurting her ankles and breaking toes. (R. 38, 40). She described her leg pain as being on the left side of her leg from her knee and stated that half of her leg stays numb from the knee up. (R. 29). She stated she often stands up to relieve the pain but it never goes away. (Id.).

The ALJ found that Plaintiff's "sciatic nerve problems, numbness and tingling in her legs and feet, broken toes" were non-severe impairments along with a number of other conditions. (R. 15). The ALJ stated that "the longitudinal record does not reflect that these conditions caused

limitations during the period at issue" and the RFC "[a]dequately accommodates the effect of the claimant's non-severe impairments acting in concert with her severe physical impairments." (Id.).

The ALJ provided little explanation for her finding that Plaintiff's leg impairments were not severe. While the ALJ explains that the record contained no treatment records for Plaintiff's other non-severe impairments, such as breathing problems, sleep apnea and bladder problems, the ALJ makes no mention of the many references in the record indicating testing and treatment for Plaintiff leg impairments. Contrary to the ALJ's assertion, Plaintiff underwent objective medical testing, was seen by neurologists and received medication for her leg impairments. Further, as outlined above, the record includes alleged limitations related to Plaintiff's leg impairments, including foot jerking, falling and difficulty with gait, walking and postural imbalance. The undersigned finds that the medical evidence as outlined above indicates that Plaintiff's sciatic nerve problems and numbness and tingling in her legs and feet ("leg impairments") were more than a "slight abnormality" with more than a "minimal effect" as to interfere with Plaintiff's ability to work. Accordingly, substantial evidence does not support the ALJ's finding that Plaintiff's leg impairments were non-severe.

> **c.    ALJ's Finding that Plaintiff's Shoulder and Leg Impairments were Non-Severe Impairments**

The Court notes that a failure by the ALJ to specifically find that Plaintiff's leg impairments were severe would not, alone, constitute reversible error. A step two error is harmless if the ALJ "continued through the remaining steps and considered all of the claimant's impairments." Syms v. Astrue, No 10-CV-499-JD, 2011 WL 4017870, at *1 (D.N.H. Sept. 8, 2011); see also Mauzy v. Astrue, No. 2:08-CV-75, 2010 WL 1369107, at *6 (N.D.W. Va. Mar. 30, 2010) (finding that it was "not reversible error for the ALJ not to designate any of the plaintiff's other medical conditions

as severe or not severe in light of the fact that he did, during later steps of the sequential evaluation process, consider the combined effect of all of the plaintiff's impairments"); see also Pompa v. Comm'r of Soc. Sec., 73 F. App'x 801, 803 (6th Cir. 2003) (explaining that "[b]ecause the ALJ found that Pompa had a severe impairment at step two of the analysis, the question of whether the ALJ characterized any other alleged impairment as severe or not severe is of little consequence. As the ALJ considered all of Pompa's impairments in her residual functional capacity assessment finding, Pompa's argument is without merit."). Accordingly, the Court must look to the remaining steps of the sequential evaluation process, including the ALJ's RFC assessment, to determine whether the ALJ properly considered and incorporated Plaintiff's shoulder and leg impairments.

2. **Whether Plaintiff's Residual Functional Capacity Assessment Incorporated all of Plaintiff's Medically Determinable Impairments.**

The issue is whether the ALJ properly considered and incorporated Plaintiff's non-severe impairments when formulating her RFC assessment and provided an adequate explanation for her conclusions. Before proceeding to step four, the ALJ must determine the claimant's residual functional capacity. 20 C.F.R. § 404.1520(e). Under the regulations, a claimant's RFC represents the most a claimant can do in a work setting despite the claimant's physical and mental limitations. 20 C.F.R. § 404.1545(a)(1). The Administration is required to assess a claimant's RFC based on "all the relevant evidence" in the case record. 20 C.F.R. § 404.1545(a)(1). This assessment only includes the "functional limitations and restrictions that result from an individual's medically determinable impairment or combination of impairments, including the impact of any related symptoms." SSR 96-8p, 1996 WL 374184, at *1 (July 2, 1996). In determining a claimant's RFC, the ALJ must consider the combined effect of both severe and non-severe medically determinable impairments: "we will consider the limiting effects of all your impairment(s), even those that are

not severe, in determining your residual functional capacity." 20 C.F.R. § 404.1545(e).

Moreover, Social Security Ruling 96-8p states that the RFC assessment must include a narrative discussion describing how the evidence supports each conclusion, citing specific medical facts and nonmedical evidence. SSR 96-8p, 1996 WL 374184, at *7 (July 2, 1996) (explaining that "the RFC assessment must…[s]et forth a logical explanation of the effects of the symptoms, including pain, on the individual's ability to work."). The ALJ's decision must contain a sufficient explanation "to allow a reviewing Court to determine whether the Commissioner's decision is supported by substantial evidence." England v. Astrue, No. CIV.A. 5:07-0133, 2008 WL 867951, at *9 (S.D.W. Va. Mar. 28, 2008). "[T]he [Commissioner] is required by both the Social Security Act, 42 U.S.C. § 405(b), and the Administrative Procedure Act, 5 U.S.C. § 557(c), to include in the text of [her] decision a statement of the reasons for that decision." Cook v. Heckler, 783 F.2d 1168, 1172 (4th Cir. 1986). The ALJ's "decisions should refer specifically to the evidence informing the ALJ's conclusion. This duty of explanation is always an important aspect of the administrative charge…." Hammond v. Heckler, 765 F.2d 424, 426 (4th Cir. 1985).

Here, the ALJ found that Plaintiff has the residual functional capacity:

> to perform light work as defined in 20 CFR 404.1567(b) except: can only occasionally climb ladders, ropes or scaffolds, ramps or stairs, crouch and crawl; can only frequently balance, stoop and kneel; must avoid concentrated exposure to extreme cold, wetness or humidity, excessive vibration and irritants such as flumes, odors, dust and gases, and hazards such as dangerous moving machinery and unprotected heights; must be afforded the opportunity for brief 1-2 minute changes of position at intervals not to exceed 30 minutes w/out being off task; and capable of only frequent handing bilaterally.

(R. 16). The regulations define "light work" as follows:

> lifting no more than 20 pounds at a time with frequent lifting or carrying of objects weighing up to 10 pounds. Even though the weight lifted may be very little, a job is in this category when it requires a good deal of walking or standing, or when it involves sitting most of the time with some pushing and pulling of arm or leg

controls. To be considered capable of performing a full or wide range of light work, you must have the ability to do substantially all of these activities. If someone can do light work, we determine that he or she can also do sedentary work, unless there are additional limiting factors such as loss of fine dexterity or inability to sit for long periods of time.

20 C.F.R. § 404.1567(b).

Plaintiff argues that the ALJ erred by failing to take into account all of Plaintiff's medically determinable impairments and other evidence when formulating her RFC assessment. (Pl.'s Br. at 9). Plaintiff asserts that the ALJ failed to include any limitations to account for Plaintiff's irritable bowel syndrome, bladder problems, shoulder condition, sciatic nerve problems, numbness and tingling in her legs and bilateral hip problems. (Id. at 10). Defendant argues that the ALJ properly considered all functional limitations when formulating Plaintiff's RFC. (Def.'s Br. at 11). The undersigned addresses each of the impairments raised by Plaintiff below:

### a. Irritable Bowel Syndrome

While the ALJ does not specifically discuss Plaintiff's irritable bowel syndrome within the RFC assessment section of her decision (R. 16-21), the ALJ does discuss Plaintiff's irritable bowel syndrome previously in her decision (R. 15). When finding that Plaintiff's irritable bowel syndrome was a non-severe impairment, the ALJ considered the medical evidence regarding the treatment of the condition including Plaintiff's initial diagnosis in 1995, her prescription to Donnatal to manage the condition, her report to Dr. Marks in March 1999 that she had "no continence problems or bowel or bladder dysfunction" and her report to Dr. Marks in February 2000 that her condition was stable. (Id.). Thus, the ALJ concluded:

Due to the claimant's sparse and conservative treatment, the undersigned has found that the claimant's irritable bowel syndrome is a nonsevere impairment with minimal associated functional limitations. Additionally, the undersigned finds that the below referenced residual functional capacity would accommodate any residuals the claimant may be experiencing due to the alleged debilitating irritable bowel syndrome.

36

(Id.). Here, the ALJ considered the medical evidence, made specific findings and provided an explanation for her conclusion that Plaintiff's irritable bowel syndrome resulted in only minimal functional limitations. After a careful review of the record and the ALJ's decision, the undersigned finds that the ALJ considered Plaintiff's irritable bowel syndrome when formulating her RFC assessment and substantial evidence supports the ALJ's decision.

**b. Shoulder Impairment**

A review of the ALJ's decision as a whole demonstrates that the ALJ considered Plaintiff's shoulder condition when formulating her RFC and provided an adequate explanation of her reasoning. The ALJ's decision demonstrates that she considered the medical evidence regarding Plaintiff's shoulder condition, including Dr. Sella's May 2000 report documenting shoulder imbalance, loss of range of motion and loss of strength in Plaintiff's right shoulder, the January 8, 2001 x-ray showing mild AC narrowing, Plaintiff's report of shoulder pain to Dr. Marks on this same date as well as June 6, 2001, and Plaintiff's report to Dr. Marks in December 2001 that her shoulder pain was improved with medication. (R. 15, 18). In her RFC assessment, the ALJ cites Dr. Sella's May 25, 2000 and comments that Dr. Sella's report "notes conditions that are likely to cause some functional limitations" and then states that the RFC "adequately accommodates the claimant's limitations." (R. 18). This statement alone fails to provide an adequate explanation to support the ALJ's reasoning as to which conditions or functional limitations she is referring to. However, when finding that Plaintiff's shoulder condition was a non-severe impairment previously in her opinion, the ALJ states that:

> the undersigned finds that the below referenced residual functional capacity would accommodate any residuals the claimant may be experiencing due to the alleged shoulder condition. Further the undersigned notes that the vocational expert testified that even if a limitation were added to the below residual functional

capacity to limit the claimant to only occasional overhead reaching with the right upper extremity that the claimant would be able to perform the jobs listed below.

(R. 15). The ALJ's decision demonstrates that the ALJ examined the relevant medical evidence, considered the effects of Plaintiff's shoulder condition and provided an explanation for her decision. Accordingly, the undersigned finds that the ALJ considered Plaintiff's shoulder condition when formulating her RFC and substantial evidence supports the ALJ's decision.

### c.    Sciatic Nerve Problems & Numbness and Tingling in Legs (Leg Impairments)

A review of the ALJ's decision shows that the ALJ failed to fully consider Plaintiff's leg impairments when assessing Plaintiff's RFC. In her RFC assessment, the only medical treatment the ALJ references regarding Plaintiff's leg impairments include Plaintiff's appointment with Dr. Marks in March 1999 where she reported low back pain "radiating down the right leg" and Dr. Sella's May 2000 report, which notes postural imbalance and gait dysfunction. (R. 17-18). Unlike the prior conditions discussed, the ALJ does not adequately discuss medical evidence, explain her consideration of limitations or provide an explanation for how she incorporated limitations (or not) as to Plaintiff's leg impairments anywhere in her decision. For example, when discussing Plaintiff's non-severe impairments, the ALJ refers to Plaintiff's sciatic nerve problems, numbness and tingling in her legs and feet, broken toes, bilateral hip problems, breathing problems, sleep apnea and bladder problems, and finds that:

the longitudinal record does not reflect that these conditions caused limitations during the period at issue. Indeed, the longitudinal record reflects no treatment for *breathing problems*, *sleep apnea*, or *bladder problems* during the entire period at issue. Therefore, the undersigned has also found these conditions to be nonsevere problems. Further, the residual functional capacity, discussed below, more than adequately accommodates the effect of the claimant's nonsevere impairments acting in concert with her severe physical impairments.

(R. 15) (emphasis added). While the ALJ states that the record fails to reflect treatment for

breathing problems, sleep apnea or bladders problems, she fails to provide an explanation for her assessment of the other conditions. Contrary to the ALJ's conclusion regarding the three listed conditions, the record does contain multiple references to treatment for Plaintiff's leg impairments.

The ALJ fails to adequately discuss this medical evidence regarding Plaintiff's leg impairments. Plaintiff reported problems with numbness and tingling in her legs as early as 1998 and continued to report problems with her foot jerking and with numbness in her legs through the date of last insured. Her diagnoses by multiple physicians, including her primary care doctor as well as specialists, included chronic lumbar radiculopathy, bilateral lower extremity symptoms, "painful legs and moving toes syndrome" and restless leg syndrome. Her doctors noted postural imbalance, decreased sensation, irregular foot movements, poor toe/heel walking, postural imbalance and gait dysfunction and she was also prescribed medication. (R. 201; 203; 377; 428; 507; 508; 511; 613). Plaintiff's EMG showed radiculopathy, sensory abnormalities of the left lower extremity and left leg focal myoclonus/restless leg syndrome. (R. 203). Plaintiff's examination by another neurologist, Dr. Tellers, showed irregular and intermittent movements of the left foot and movement of the toes. (R. 508). The ALJ does not mention any of this treatment nor discuss whether or not the symptoms associated with the leg impairments could cause limitations on Plaintiff's ability to work.[4] The ALJ also fails to discuss any of Plaintiff's subjection allegations regarding her leg impairment symptoms, including difficulty standing, falling and hurting her ankles and toes. See supra p. 32.

The ALJ also fails to provide an adequate explanation for her decision regarding Plaintiff's leg impairments. The ALJ's conclusory statement that she "considered" the conditions and that

---

[4] For a full recitation of medical records relevant to Plaintiff's leg impairments please see above. See supra pp. 30-32 Part VI.C.1.b (discussing Plaintiff's leg impairments as severe or non-severe impairments).

the RFC "adequately accommodates" any functional limitations mentioned in Dr. Sella's report does not provide the Court a logical explanation as to what conditions and functional limitations the ALJ actually considered and how the RFC adequately accommodates the same. Without an adequate review or discussion of Plaintiff's treatment, diagnoses and reported symptoms associated with her leg impairments, the undersigned is unable to determine whether the ALJ considered these conditions and associated limitations when formulating her RFC. The ALJ's conclusory statement that Plaintiff's limitations are included in the RFC is insufficient to demonstrate that the ALJ did indeed consider the impairments. Accordingly, the undersigned finds that substantial evidence does not support the ALJ's RFC assessment because she failed to provide an adequate explanation as to whether or how she considered Plaintiff's leg impairments when formulating her RFC.

### d. Bilateral Hip Pain

Similar to the ALJ's approach to Plaintiff's leg impairments, the ALJ fails to provide a discussion or explanation for Plaintiff's bilateral hip pain. Unlike the irritable bowel syndrome and shoulder pain, the ALJ does not reference Plaintiff's hip condition when discussing Plaintiff's non-severe impairments. (R. 15). In her RFC assessment, the ALJ states that Plaintiff reported bilateral hip pain to Dr. Sella on May 25, 2000 and includes Dr. Sella's finding regarding trigger points on the right piriformis. (R. 18). The ALJ also discussed Plaintiff's success with trigger point injections, which Plaintiff received not only in her back, but also her hips. (R. 19). However, the ALJ appears to limit her analysis regarding the success of the injections to Plaintiff's back condition when she states that "Dr. Sella's reports regarding the claimant [sic] injections, indicate that with proper treatment the claimant's pain symptoms from her *back condition* would result in minimal restrictions in the claimant's functional abilities." (Id.) (emphasis added). There is no

40

additional mention of Plaintiff's bilateral hip pain in the ALJ's decision.

Contrary to the records discussed by the ALJ, the medical evidence contains reports of Plaintiff's bilateral hip pain and treatment for the pain. Beginning in May 1991, Plaintiff reported occasional burning pain extending from her left hip down to her knee (R. 186); in April 1995, an x-ray of the right hip was normal (R. 394); in May 1998, Plaintiff reported bilateral hip pain to Dr. Govindan (R. 653); Plaintiff continued to report hip pain to Dr. Marks in 1999 (R. 428). On July 27, 1999, Plaintiff's x-ray of her hips showed mild sclerosis around each SI joint with a lower lumbar laminectomy defect and no significant arthritic change since 1995. (R. 393, 398). In August 1999, Dr. Govindan's neurological examination indicated some tenderness at the sacroiliac joint bilaterally. (R. 613). In early 2000, Plaintiff reported chronic low back pain to Dr. Marks but did not specifically note hip pain. (R. 508-09). In May 2000, Plaintiff reported bilateral hip pain to Dr. Sella, who found "trigger points with powerful jump response on the quaratus lumborum, more on the right than on the left, on L4-L5 paraspinals bilaterally, on gluteus major bilaterally, probably on the right piriformis." (R. 390). Dr. Sella also found postural imbalance and gait dysfunction. (R. 391). Throughout 2000 and 2001, Plaintiff presented to appointments with Dr. Sella, who diagnosed Plaintiff with bilateral hip pain (R. 303) and treated Plaintiff with trigger point injections in both her hips on a monthly basis (R. 273-97; 304-28). Plaintiff continued to report hip problems and receive trigger point injections following her date of last insured, including reports of loss of range of motion of the hip in 2002 and 2003 (R. 244, 250) and a report by Dr. Sella in 2004 that Plaintiff had thirty percent decreased range of motion in her lower back/hip (R. 377).

In addition to the medical evidence, Plaintiff's testimony also included statements regarding her bilateral hip pain. Plaintiff testified that standing causes her hips and lower back to tighten up and hurt, which requires her to lean against something flat or sit down. (R. 41). She

testified that she could walk about two blocks but had difficulty walking in the cold. (Id.).

In her decision, the ALJ fails to adequately discuss evidence regarding Plaintiff's hip pain, Plaintiff's treatment, including trigger point injections, and any alleged limitations associated with Plaintiff's hip condition. While Plaintiff's bilateral hip pain may not be disabling or may not result in functional limitations, the ALJ must provide some explanation to allow the reviewing court to follow the ALJ's reasoning. See England, 2008 WL 867951, at *9. Here, the ALJ only offers her conclusory statement that she considered Plaintiff's conditions and that the RFC of light work with postural and environmental limitations adequately accommodates Plaintiff's limitations. The ALJ fails to discuss Plaintiff's bilateral hip pain, cite medical evidence regarding Plaintiff's treatment for hip pain, mention possible limitations or provide an adequate explanation. This failure leaves the undersigned unable to determine whether the ALJ considered Plaintiff's bilateral hip pains when formulating her RFC. Accordingly, the undersigned finds that substantial evidence does not support the ALJ's RFC assessment.

### 3. The ALJ's Credibility Analysis

The remaining issue raised by the Plaintiff concerns whether the ALJ correctly considered Plaintiff's credibility. The determination of whether a person is disabled by pain or other symptoms is a two-step process. See Craig v. Chater, 76 F.3d 585, 594 (4th Cir. 1996); see also 20 C.F.R. § 404.1529(c)(1); SSR 96-7p, 1996 WL 374186 (July 2, 1996). First, the ALJ must expressly consider whether the claimant has demonstrated by objective medial evidence an impairment capable of causing the degree and type of pain alleged. See Craig, 76 F.3d at 594. Second, once this threshold determination has been made, the ALJ considers the credibility of the claimant's subjective allegations of pain or other symptoms in light of the entire record. Id.

Social Security Ruling 96-7p sets out some of the factors used to assess the credibility of

an individual's subjective symptoms, including allegations of pain. Some of the factors include: the individual's daily activities; the location, duration, frequency, and intensity of the individual's pain or other symptoms; any medication taken to alleviate pain or symptoms; and treatment and other measures used to relieve symptoms. See SSR 96-7p. The ALJ must do more than "recite the factors that are described in the regulations for evaluating symptoms." Id. Rather, the ALJ's "decision must contain specific reasons for the finding on credibility, supported by the evidence in the case record, and must be sufficiently specific to make clear to the individual and to any subsequent reviewers the weight the adjudicator gave to the individual's statements and the reasons for that weight." Id. There is no requirement that the ALJ state specific findings as to each factor. See Epperson v. Astrue, No. 2:11CV12-D, 2012 WL 3862717, at *4 (E.D.N.C. Sept. 5, 2012).

Plaintiff argues that the ALJ failed to comply with the requirements of SSR 96-7p and the rationale for the ALJ's credibility finding is insufficient. (Pl.'s Br. at 11; Pl.'s Reply at 4). Plaintiff explains that the ALJ failed to summarize Plaintiff's testimony and instead relied on treatment notes to ascertain Plaintiff's activities of daily living. (Id. at 12). Second, the ALJ failed to explain how Plaintiff's physical allegations were inconsistent with her testimony or the evidence. (Id.). In addition, the ALJ failed to properly weigh the factors as required when considering Plaintiff's credibility while instead focusing on Plaintiff's work history and non-specific statements made within treatment records regarding Plaintiff's limited care for her grandchild. (Id.).

Defendant argues that the ALJ followed controlling regulations in making her credibility determination. (Def.'s Br. at 13). Defendant asserts the ALJ explained that Plaintiff's complaints were inconsistent with the record, including Plaintiff's course of treatment, the clinical findings showing no disabling impairment and her daily activities. (Id. at 13-14). Defendant further explains that the ALJ did consider the SSR 96-7p factors and did not solely rely on daily activities and her

work record as alleged by Plaintiff. (Id. at 14). Defendant also asserts that the ALJ did specifically discuss Plaintiff's testimony as to her daily activities, including that she testified she did plastic canvas sewing, cared for her grandchildren and was able to do dishes and pick up. (Id.).

The undersigned has already found that substantial evidence does not support the ALJ's determination that Plaintiff's leg impairments were non-severe and the ALJ erred by failing to consider all of Plaintiff's medically determinable impairments through the remainder of the sequential evaluation process, including the RFC assessment. As in the ALJ's RFC assessment, the ALJ's credibility determination fails to discuss Plaintiff's allegations regarding her non-severe impairments or why those symptoms are not credible.

When making her credibility determination, the ALJ considered Plaintiff's treatment for her conditions, including medication and trigger point injections, her activities of daily living and her prior work history. However, the ALJ's discussion of Plaintiff's treatment for her conditions is limited to Plaintiff's back condition and carpal tunnel syndrome. The ALJ notes that Plaintiff:

> has alleged *debilitating back condition* for which the claimant's primary care physician's examinations have been generally unremarkable…and for which Dr. Sella reported that with injections the claimant reported limited pain, that she was able to do many more activities of daily living after the injections, and was leading a much fuller life without pain. Additionally, the claimant has alleged debilitating *carpal tunnel syndrome* for which the claimant has had only minimal to mild findings, indicating the claimant symptoms are not as severe as alleged. Therefore, the undersigned finds the claimant's conditions are not as severe as alleged.

(R. 20) (emphasis added). The ALJ goes on to discuss Plaintiff's activities of daily living. The ALJ notes Plaintiff's report in March 1999 that she was watching her grandchildren, which the ALJ noted is "quite physically demanding." (Id.). The ALJ further discussed Plaintiff's testimony that she "did a lot of plastic canvas sewing" and that she testified "her grandchildren kept her busy and that she was able to do dishes and pick up." (Id.). The ALJ thus concluded that "these factors

detract from the claimant's credibility concerning the severity of her symptoms including debilitating back pain and carpal tunnel symptoms." (Id.). Next, the ALJ discusses Plaintiff's work history. The ALJ considered Plaintiff's ability to return to work for three years after her back surgery "with reported earnings substantially greater than her employment prior to this surgery…indicating that the claimant was able to remain gainfully employed with the claimant's allegedly debilitating back condition." (R. 17). The ALJ further noted that "the longitudinal record reflects no significant declines in the claimant's physical conditions during the period at issue." (Id.). Lastly, the ALJ gives "significant weight" the State agency consultant's physical assessment, which found Plaintiff could perform a range of light work. (R. 21).

While the ALJ does discuss some of the SSR 96-7p factors, the ALJ's credibility determination fails to demonstrate that the ALJ considered Plaintiff's subjective allegations related to her non-severe impairments, including her shoulder pain, leg impairments and bilateral hip pain. See Craig, 76 F.3d at 594. The ALJ's analysis instead largely deals with Plaintiff's treatment and allegations for her back condition and carpal tunnel syndrome and Plaintiff's activities of daily living as they relate to these conditions. The ALJ does not discuss Plaintiff's subjective allegations regarding her other impairments. Accordingly, the undersigned finds that substantial evidence does not support the ALJ's credibility determination.

By reaching the conclusion that substantial evidence does not support the ALJ's RFC assessment or credibility determination, the undersigned does not make any finding regarding whether Plaintiff's non-severe impairments, alone or in combination with her other impairments, are disabling, and what, if any, functional limitations they might cause, or if the impairments, alone or in combination with her other impairments, meet the durational requirement.

## VII.    RECOMMENDATION

For the reasons herein stated, I find that the Commissioner's decision denying the Plaintiff's application for Disability Insurance Benefits is not supported by substantial evidence. Accordingly, I **RECOMMEND** that Plaintiff's Motion for Summary Judgment (ECF No. 14) be **GRANTED**, Defendant's Motion for Summary Judgment (ECF No. 17) be **DENIED**, the decision of the Commissioner be reversed and this case be **REMANDED** for further proceedings consistent with this Recommendation and this matter be dismissed from the Court's active docket.

Any party may, within fourteen (14) days after being served with a copy of this Report and Recommendation, file with the Clerk of the Court written objections identifying the portions of the Report and Recommendation to which objections are made, and the basis for such objections. A copy of such objections should also be submitted to the Honorable Gina M. Groh, United States District Judge. Failure to timely file objections to the Report and Recommendation set forth above will result in waiver of the right to appeal from a judgment of this Court based upon such Report and Recommendation. 28 U.S.C. § 636(b)(1); United States v. Schronce, 727 F.2d 91 (4th Cir. 1984), cert. denied, 467 U.S. 1208 (1984); Wright v. Collins, 766 F.2d 841 (4th Cir. 1985); Thomas v. Arn, 474 U.S. 140 (1985).

The Court directs the Clerk of the Court to provide a copy of this Report and Recommendation to all counsel of record, as provided in the Administrative Procedures for Electronic Case Filing in the U.S. District Court for the Northern District of West Virginia.

Respectfully submitted this 27th day of February, 2015.

ROBERT W. TRUMBLE
UNITED STATES MAGISTRATE JUDGE